**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. ______________**

DAVID PHILLIP AND CARLY PHILLIP, Each Individually and as Next Friends to C.P., P.P., S.P., AND R.P.,

Plaintiffs,

v.

THE MICHAELS ORGANIZATION, LLC, AMC East Communities, LLC, and MMS Air Force, LLC,

Defendants.
____________________________________________/

## COMPLAINT

Plaintiffs, David Phillip, a Staff Sergeant in the United States Marine Corps stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through false and misleading statements and the failure to disclose known hazards. When these conditions were discovered, Defendants failed

to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiffs DAVID PHILLIP and CARLY PHILLIP resided at MacDill in Tampa, Florida at all times relevant to this Complaint. DAVID PHILLIP and CARLY PHILLIP are the parents of Plaintiffs C.P., P.P., S.P., and R.P who also resided at MacDill at all relevant times.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Upon information and belief, AMC is listed as the "Owner" on the lease signed by the Plaintiffs.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and maintenance activities relating to military housing at MacDill. Upon information and

belief, it presents itself as the landlord, appearing as the "Landlord/Lessor" on Mold Addenda, even though Defendant AMC is the owner or the lessor on the leases. Upon information and belief, Harbor Bay, through Michaels Management Services, Inc., is also listed as the Property Manager and Community Manager on Plaintiffs' lease and the lease addenda. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6. In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive federal legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d

123, 124 (5th Cir. 1952).

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9. This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2),48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10. In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11. Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12. In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13. Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

**MHPI Housing at MacDill**

14. In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15. Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16. Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

**Defendants' Joint and Integrated Approach to MacDill Housing**

17. Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18. With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19. The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Phillip Family**

24. Staff Sergeant ("SSgt") David Phillip, United States Marine Corps ("USMC"), his spouse, Carly Phillip, and their four minor children C.P., P.P., S.P., and R.P., resided at 8468 Fortress Drive at MacDill Air Force Base.

25. SSgt Phillip signed a lease with Defendants prior to moving into the home. Upon information and belief, Plaintiffs' lease listed AMC as the Owner and Harbor Bay, through Michaels Management Services, Inc., as the Property Manager.

Plaintiffs' lease provided that Florida law applied.

26. Upon information and belief, Plaintiffs' lease represented that, prior to moving in, the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion. Defendants either knew these representations were false or made them without any reasonable basis to know whether they were true, with the intent to induce the Phillip family to accept the residence.

27. Before the Phillip family moved into the residence, Harbor Bay Assistant Community Director Geri Leto represented that the home had been "newly renovated" following a previous hurricane. Defendants failed to disclose that the home had previously been occupied by two separate military families who had reported mold contamination and neurological symptoms while living there. Nor did Defendants disclose that the home had a history of repeated mold complaints. The Phillip family relied on Defendants' representations in accepting the residence and would not have moved into the home had they known its true condition.

28. During their tenancy, Plaintiffs came into contact with, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

29. From early in their tenancy, the Phillip family encountered many of the same conditions reportedly experienced by previous occupants. On or about September 10, 2022, Ms. Phillip observed visible mold around the kitchen air vents and attic access panel. After she submitted a maintenance request, a Harbor Bay technician

dismissed the visible mold as "dust," ordered only a duct cleaning, and represented that the attic area had already been addressed. After the technician left, however, Ms. Phillip discovered that nothing around the attic access had changed. During the duct cleaning, contractors hired by Harbor Bay failed to establish any containment while the Phillip family remained inside the home, exposing them to the mold that became disturbed throughout the residence. The identities of the Harbor Bay technician and contactors are known to Defendants and is within their possession, custody, or control.

30. Approximately three months later, on December 10, 2022, Ms. Phillip discovered water leaking through the kitchen ceiling from the upstairs bathroom and immediately submitted an emergency work order. A Harbor Bay technician responded but attributed the leak to "too much water in the tub upstairs." Despite finding no evidence supporting that explanation and despite the absence of any wet conditions upstairs, Harbor Bay performed no meaningful investigation into the source of the water intrusion. Instead, the technician placed drying fans inside the home and closed the work order without identifying or correcting the underlying problem. The identity of the Harbor Bay technician is known to Defendants and is within their possession, custody, or control.

31. Throughout 2023, Ms. Phillip continued reporting mold around the kitchen vents and attic access on at least four or five additional occasions. Each time, Harbor Bay maintenance personnel characterized the visible mold as "dust," closed the work orders, and failed to conduct appropriate mold testing, identify the source of the moisture intrusion, or perform proper remediation. As a result, the Phillip family

remained exposed to ongoing water intrusion, elevated moisture, and fungal contamination throughout their home. The identities of the Harbor Bay maintenance personnel are known to Defendants and is within their possession, custody, or control.

32. During the summer of 2023, while pregnant with the couple's fourth child, Ms. Phillip began experiencing alarming neurological symptoms, including repeated episodes of peripheral vision loss and blackouts. On or about November 1, 2023, Ms. Phillip again lost her vision, collapsed, and suffered back-to-back seizures. Emergency medical personnel transported her to Tampa General Hospital, where imaging revealed a large brain mass.

33. Because of the medical emergency, physicians performed an emergency Cesarean section, and R.P. was delivered approximately four weeks prematurely, requiring oxygen support in the Neonatal Intensive Care Unit. Following delivery, additional imaging revealed an orange-sized brain tumor. Pathology confirmed that Ms. Phillip suffered from a Grade III astrocytoma, an aggressive and rare form of brain cancer often attributed to environmental exposures. On November 28, 2023, she underwent neurosurgery to remove as much of the tumor as possible. As a result of the surgery and the tumor's location, Ms. Phillip permanently lost the peripheral vision in her left eye and sensation in portions of her left leg. She subsequently endured months and multiple rounds of radiation and chemotherapy, completing radiation in March 2025 and chemotherapy in June 2025. Because the tumor could not be completely removed, her physicians have advised that it is expected to recur and become increasingly aggressive over time, requiring lifelong monitoring.

34. Even while Ms. Phillip recovered from brain surgery and underwent intensive cancer treatment, mold continued developing around the home's vents and attic access. Harbor Bay again dismissed the visible growth as "dust" despite repeated complaints.

35. After Hurricane Milton struck the MacDill area in October 2024, Harbor Bay informed the Phillip family that maintenance personnel had entered the home during the evacuation, observed "some water damage," and would schedule repairs. When the family returned on or about October 11, 2024, they instead discovered substantial roof failure, water intrusion in all four bedrooms, ceiling damage, and additional water damage surrounding the attic access panel. A third-party contractor hired by Harbor Bay subsequently documented widespread saturation within the home's walls and ceilings, confirming extensive water intrusion throughout the residence. The identities of the Harbor Bay maintenance personnel and contractors are known to Defendants and are within their possession, custody, or control.

36. Despite Ms. Phillip actively undergoing chemotherapy and radiation treatments, Harbor Bay informed the family that their home was "not a priority." Only after a couple of weeks of repeated requests was the family temporarily relocated to an on-base Temporary Living Facility, where they discovered additional mold contamination. Approximately six weeks later, Harbor Bay directed the family to return to their residence, representing that all repairs had been completed. Upon returning, the family observed that water stains remained on the ceilings, mold remained around the attic access, and the apparent repairs consisted largely of painting over the existing

damage. When Ms. Phillip complained, Harbor Bay representatives repeatedly instructed her to "put in a ticket." She did. No meaningful follow-up occurred. She later attended a Harbor Bay town hall meeting in January 2025, where staff collected her contact information and assured her someone would follow up. No one ever did. The identities of the Harbor Bay representatives are known to Defendants and is within their possession, custody, or control.

37. Throughout their tenancy, members of the Phillip family experienced significant physical and emotional harm. The family endured chronic sleep disruption, persistent fatigue, ongoing stress, and constant anxiety regarding the deteriorating condition of the residence, and the risks the environmental conditions posed to Ms. Phillip because of her immunocompromised condition. Ms. Phillip also had brain fog and headaches. Child C.P. developed a diagnosed mold allergy. P.P. and S.P. suffered persistent respiratory illnesses. R.P., who was born prematurely during Ms. Phillip's medical emergency, remained medically fragile. SSgt Phillip developed worsening skin conditions, sleep issues and insomnia while attempting to care for his family throughout the ongoing environmental problems within the home. The family also sustained damage to personal property, endured extraordinary medical trauma, and experienced substantial emotional distress while attempting to navigate Ms. Phillip's brain cancer diagnosis and treatment in a home that Defendants repeatedly represented as safe.

38. The Phillip family came into contact with and inhaled or ingested mold and other hazardous substances and suffered severe physical injuries, emotional distress, financial losses, and other damages as a direct result of Defendants' acts and

omissions. Had the Phillip family known the true history and dangerous condition of the residence, they would never have moved into or remained in the home. They continue to live with the lasting physical, emotional, and financial consequences of Defendants' failure to disclose known hazards and to properly investigate, remediate, and repair their home.

39. Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law. Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and, on information and belief, and on information and belief Plaintiffs' lease contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (against Defendant AMC)

40. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

41. Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

42. AMC failed to comply with the material terms of the lease by failing to

ensure Plaintiffs' house was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

43. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

**COUNT II: Negligence**
**(against all Defendants)**

44. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

45. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

46. As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

47. As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty

to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

48. Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs under Florida law.

49. Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

50. Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failure to remediate defects they knew, or reasonably should have known, would cause moisture intrusion, elevated indoor humidity, and microbial growth; (b) failure to reasonably repair and remediate issues related to mold, moisture, and water intrusion, including the mold around the kitchen vents and attic access, the December 2022 kitchen-ceiling leak, and the post-Hurricane Milton roof failure and water intrusion in all four bedrooms; (c) failure to adequately respond to the Phillip family's repeated complaints regarding unsafe conditions in their home; (d) failure to implement appropriate safety protocols to protect residents from toxic mold, including containment during work that disturbed mold; (e) failure to investigate and identify the source of recurring water intrusion before closing work orders; (f) failure to take corrective action to address hazardous conditions in Plaintiffs' home of which Defendants had or should have had knowledge; (g) use of untrained and/or unlicensed

workers to repair and remediate Plaintiffs' home; (h) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; (i) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; (j) repeatedly characterizing visible mold around the kitchen vents and attic access as "dust,"; (k) ordering only duct cleaning, without containment, and closing work orders without conducting mold testing, identifying the source of the moisture intrusion, or performing proper remediation; (l) failing to timely address the post-Hurricane Milton roof failure and water intrusion in all four bedrooms, telling the family their home was "not a priority" even as Ms. Phillip underwent cancer treatment, and relocating the family only after one to two weeks of repeated requests; (n) representing that repairs were complete when they consisted largely of painting over existing water stains and damage, while mold remained around the attic access; and (o) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

51. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

52. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT III: Gross Negligence**
**(against all Defendants)**

53. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

54. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

55. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

56. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

57. Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

58. Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) placing the family in a home Defendants knew had a history of mold contamination and prior occupants who had reported mold-related illness, without disclosure; (b) failure to reasonably repair and remediate the mold, moisture, and water intrusion the family repeatedly reported; (c) failure to implement appropriate safety protocols to protect residents from toxic mold, including containment during work that disturbed mold; (d) failure to investigate and identify the source of recurring water intrusion before closing work orders; (e) failure to take corrective action to address hazardous conditions in Plaintiffs' home of which Defendants had or should have had knowledge; (f) use of untrained and/or unlicensed workers to repair and remediate Plaintiffs' home; (g) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; (h) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; (i) repeatedly characterizing the visible mold around the kitchen vents and attic access as "dust," ordering only duct cleaning, without containment, and closing work orders without conducting mold testing, identifying the source of the moisture intrusion, or performing proper remediation; (j) attributing the December 2022 kitchen-ceiling leak to "too much water in the tub upstairs," merely placing drying fans, and closing the work order without identifying or correcting the source of

the water intrusion; (k) representing that repairs were complete when they consisted largely of painting over existing water stains and damage, while mold remained around the attic access; and (m) engaging in additional safety violations and breaches of the duty of care to be determined upon discovery.

59. Each of the Defendants' reckless indifference to the rights of Plaintiffs is equivalent to an intentional violation of them.

60. As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

61. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

62. By their acts and omissions, Defendants caused Plaintiffs to be exposed to and come into direct physical contact with mold and mold-contaminated conditions within their home.

63. As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, allergic reactions, skin conditions, and other bodily harm.

64. As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish,

suffering, and grief. Plaintiffs suffered additional physical injuries as a result of the emotional distress.

65. Plaintiffs' claims for emotional distress arise directly from physical impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home, and the members of the family suffered resulting physical injuries, including such conditions as respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Plaintiffs' emotional distress arises from, and is accompanied by, physical manifestations and injuries.

66. Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs. Defendants also knew or should have known that their assurances that Plaintiffs' home was safe and not infested with mold, and their assurances that they would repair Plaintiffs' home, would cause Plaintiffs to remain in their home and suffer ongoing harm.

67. Defendants knew or should have known that their statements that remediation was complete were, in fact, assurances that Plaintiffs' home was safe and not infested with mold, and that Plaintiffs would rely on those assurances and continue to occupy the home and suffer physical injury.

68. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with mold.

69. Plaintiffs suffered severe emotional distress as a result of that unhealthy

and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

70. Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

**COUNT VI: Intentional Infliction of Emotional Distress**
**(against all Defendants)**

71. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

72. Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

73. Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

74. This intentional conduct, which subjected Plaintiffs to risk of serious injury or illness over a prolonged period, was extreme and outrageous.

75. Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of decency and intolerable in a civilized community.

76. This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

77. Plaintiffs suffered emotional and physical injury due to their severe

emotional distress.

**COUNT VII: Breach of the Warranty of Habitability**
**(against Defendant AMC)**

78. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

79. AMC breached express and implied warranties of habitability.

80. AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs' home. AMC failed to meet the standard of care in performing those duties. Upon information and belief, in their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

81. AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, in order to make necessary repairs, and transfer them to a reasonably safe home.

82. After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have remediated.

83. As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with toxic mold. Plaintiffs suffered

special damages and will require ongoing testing/medical monitoring.

**COUNT VIII: Third-Party Beneficiary Contract**
**(against all Defendants)**

84. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

85. Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

86. The Operating Agreement originally entered into by AMC East, LLC and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

87. On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

88. On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

89. Defendants and the Air Force intended to benefit the service members living at MacDill. SSgt Phillip is a servicemember living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying

contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

90. Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

91. Defendants also breached the duty of good faith and fair dealing implied in the contracts.

92. As a foreseeable result of the Defendants' breaches of the contracts, Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

**COUNT IX: Negligence Per Se**
**(against all Defendants)**

93. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

94. Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

95. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

96. For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

97. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

98. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of

the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

99. Plaintiffs are members of the class that each of the above statutes were designed to protect.

100. The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

101. Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of residential housing and the health and safety of occupants.

102. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

**COUNT X: Medical Monitoring**
**(against all Defendants)**

103. Plaintiffs incorporate the allegations set forth in paragraphs 1-39.

104. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

105. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination at 8468 Fortress Drive, the Phillip family faces an increased and individualized risk of developing chronic and latent health conditions.

106. Ms. Phillip developed a Grade III astrocytoma—an aggressive and rare brain cancer often associated with environmental exposures—that could not be fully resected and is expected to recur; she suffered permanent loss of peripheral vision and of sensation in portions of her left leg, and requires lifelong imaging and oncologic monitoring.

107. The Phillip children require ongoing evaluation and monitoring: C.P. has a diagnosed mold allergy; P.P. and S.P. suffered persistent respiratory illnesses; and R.P., born approximately four weeks prematurely during Ms. Phillip's medical emergency and requiring NICU oxygen support, remains medically fragile. As minor children whose immune and respiratory systems are still developing, they face heightened long-term vulnerability from prolonged mold exposure, making early and ongoing monitoring critical.

108. SSgt Phillip developed worsening skin conditions during the period of exposure and likewise requires ongoing evaluation, and both parents face heightened long-term risk given the family's prolonged exposure.

109. The mold repeatedly observed around the home's kitchen vents and attic access, the December 2022 water intrusion, the post-Hurricane Milton roof failure and widespread saturation, and the residence's documented history of mold complaints and prior occupants' reported illnesses corroborate the Phillip family's exposures and inform the monitoring reasonably necessary for each Plaintiff according to contemporary scientific principles.

110. Early detection through monitoring is material because the chronic and

latent conditions associated with mold exposure may not manifest clinically for months or years after the exposure ends. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Phillip family would benefit from regular evaluation.

111. The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

112. Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

113. Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

**COUNT XI: Unjust Enrichment**
**(against Defendant AMC)**

114. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

115. Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill Air Force Base.

116. AMC failed to provide Plaintiffs with a safe and habitable home, and it failed to fully compensate Plaintiffs for the costs and inconvenience of their displacement from the home following Hurricane Milton—including an extended stay in an on-base Temporary Living Facility that itself contained mold—while Defendants performed remediation and repairs, and it ultimately failed to deliver the safe and

habitable housing for which Plaintiffs' BAH was paid. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

117. Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)**
**(against all Defendants)**

118. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

119. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

120. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

121. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

122. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

123. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and

procedures for the treatment and remediation of mold.

124. Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

125. Given those unconscionable conditions, Plaintiffs' interest in their MacDill home was only worth a small fraction of the rental payments for that home.

126. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

127. As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT.§ 501.211.

**COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)**

128. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

129. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

130. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing.

Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

131. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

132. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

133. On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

(a) Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign a lease that they never would have signed had they known the truth;

(b) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far more valuable than it was in reality;

(c) on information and belief, in the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

(d) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

(e) once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

(f) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords; and

(g) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

134. As a few examples, Defendants falsely (a) represented, through Assistant Community Director Geri Leto, that the home had been "newly renovated" while concealing its documented history of mold contamination, prior occupants' reported illnesses, and pending litigation concerning similar conditions; (b) repeatedly characterized visible mold as "dust" and performed only duct cleaning without testing or remediation; and (c) represented that post-Hurricane Milton repairs had been completed when they consisted largely of painting over existing water stains and damage.

135. As a result of Defendants' deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT.§ 501.211.

136. Plaintiffs paid far more in rent than their home was actually worth.

137. Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs,

remodeling, and remediation, and the existence of mold and other hazardous conditions.

138. As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

**COUNT XIV: Negligent Misrepresentation Concerning Condition of the Home**
**(against all Defendants)**

139. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

140. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

141. Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

142. Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

143. Before the Phillip family accepted the residence, Harbor Bay Assistant Community Director Geri Leto represented that the home had been "newly renovated" following a previous hurricane. Defendants did not disclose that the home had previously been occupied by two separate military families who had reported mold

contamination and neurological symptoms while living there, that the home had a history of repeated mold complaints, or that the home was at that time the subject of litigation involving similar environmental conditions. Those representations were false or materially incomplete when made.

144. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

145. Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

146. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

147. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

148. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

149. Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

150. When Plaintiffs requested that Defendants repair unsafe and hazardous

conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

151. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

152. Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

153. As a few examples, Defendants falsely (a) repeatedly characterized visible mold around the kitchen vents and attic access as "dust," ordered only duct cleaning, and represented that the attic area had been addressed when it had not; (b) attributed the December 2022 kitchen-ceiling leak to "too much water in the tub upstairs" and merely placed drying fans, closing the work order without investigating or correcting the source; and (c) after Hurricane Milton, represented that all repairs had been completed when the apparent repairs consisted largely of painting over existing water stains and damage, while mold remained around the attic access.

154. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

155. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

156. As a direct and proximate result of Defendants' negligence, Plaintiffs

suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVI: Fraudulent Inducement**
**(against all Defendants)**

157. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

158. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease.

159. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

160. These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

161. Before the Phillip family accepted the residence, Harbor Bay Assistant Community Director Geri Leto represented that the home had been "newly renovated" following a previous hurricane. Defendants did not disclose that the home had previously been occupied by two separate military families who had reported mold contamination and neurological symptoms while living there, that the home had a history of repeated mold complaints, or that the home was at that time the subject of litigation involving similar environmental conditions. Those representations were false

or materially incomplete when made.

162. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

163. Defendants knew or reasonably should have known that these statements, including the representations in the lease, were false. But for the Defendants' false statements, Plaintiffs would not have signed the lease or moved into their home.

164. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

165. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

166. Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in it.

167. Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

168. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having

themselves inspected and performed repair work at the home.

169. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew, from their own technicians' prior visits to the home, that they had not adequately done so.

170. As a few examples, Defendants falsely (a) repeatedly characterized visible mold around the kitchen vents and attic access as "dust," ordered only duct cleaning, and represented that the attic area had been addressed when it had not; (b) attributed the December 2022 kitchen-ceiling leak to "too much water in the tub upstairs" and merely placed drying fans, closing the work order without investigating or correcting the source; and (c) after Hurricane Milton, represented that all repairs had been completed when the apparent repairs consisted largely of painting over existing water stains and damage, while mold remained around the attic access.

171. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

172. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

173. These representations were material to Plaintiffs' decisions to remain in their home.

174. But for Defendants' false statements, Plaintiffs would not have remained in their home.

175. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical

injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVIII: Fraudulent Concealment of Condition of Housing (against all Defendants)**

176. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

177. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing in order to cause Plaintiffs to sign a lease for their MacDill home.

178. On information and belief, Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

179. Defendants concealed the residence's documented history of mold contamination and prior occupants' reported mold-related and neurological illnesses, as well as the then-pending litigation concerning similar conditions at MacDill, none of which was disclosed to the Phillip family before they accepted and occupied the home.

180. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

181. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

182. Defendants knew that their concealments would induce Plaintiffs to act.

183. Plaintiffs relied on Defendants' concealments and omissions.

184. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have signed the lease or moved into home.

185. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

186. Plaintiffs incorporate the allegations set forth in paragraphs 1–39.

187. Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their home.

188. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

189. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

190. As a few examples, Defendants falsely (a) repeatedly characterized visible mold around the kitchen vents and attic access as "dust," ordered only duct

cleaning, and represented that the attic area had been addressed when it had not; (b) attributed the December 2022 kitchen-ceiling leak to "too much water in the tub upstairs" and merely placed drying fans, closing the work order without investigating or correcting the source; and (c) after Hurricane Milton, represented that all repairs had been completed when the apparent repairs consisted largely of painting over existing water stains and damage, while mold remained around the attic access.

191. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

192. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

193. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

194. Plaintiffs relied on Defendants' concealments and omissions.

195. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their home.

196. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Nuisance damages, including inconvenience, illness, and fear;

k. Out of pocket expenses;

l. Loss of and/or damage to personal property;

m. Costs, expenses, and fees, including attorneys' fees; and

n. Punitive damages.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, XIX, in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED: September 9, 2026.

Respectfully submitted,

*/s/ Robert J. McKee*
Robert J. McKee
Florida Bar No.: 972614
**THE MCKEE LAW GROUP, LLC**
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email:
rmckee@themckeelawgroup.com
*Lead Counsel*

Vincent J. Colatriano*
Michael Weitzner*
**COOPER & KIRK, PLLC**
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

Kristina Baehr*
**JUST WELL LAW, PLLC**
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Militaryhousing-lit_PLslistserv@well.law

**Pro Hac Vice forthcoming*
*Attorney for Plaintiffs*